IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| CAROL A. COOPER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civ. No.: _____ |
| v. | ) | Judge: _____ |
| | ) | |
| BUC-EE'S TENNESSEE II, LLC | ) | **JURY TRIAL DEMAND** |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

COMES NOW, the Plaintiff, CAROL A. COOPER, who sues the Defendant, BUC-EE'S

TENNESSEE II, LLC, and for cause of action would show unto this Honorable Court as follows:

1.     Plaintiff, Carol A. Cooper, is a resident of Sevier County, Sevierville, Tennessee.

2.     Defendant, Buc-ee's Tennessee II, LLC, is a limited liability company authorized

to do business in Tennessee with its principal place of business located at 327 FM 2004 Road,

Lake Jackson, Texas, 77566-4980, and may be served with process through its Registered Agent,

C T Corporation System, 300 Montvue Road, Knoxville, TN 37919-5546.

3.     Jurisdiction is founded upon Federal Question, 28 U.S.C. § 1331, arising under 42

U.S.C. § 2000e, *et seq.*, and 42 U.S.C. § 1981a, *et seq.*, and the doctrine of Supplemental

Jurisdiction, 28 U.S.C. § 1367.

4.     Venue is proper under the code provisions cited herein, as well as the general venue

provisions of 28 U.S.C. § 1391.

5.     At all times stated herein, Defendant was an employer subject to the provisions of

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, the Civil Rights Act of 1991,

42 U.S.C. § 1981a, *et seq.*, and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, *et seq.*

6.     At all times material hereto, Defendant was engaging in an industry affecting commerce, and, on information and belief, employed more than five hundred and one (501) employees.

7.     At all times material hereto, Defendant had a duty to take prompt and effective remedial action when made aware of sexual harassment.

8.     Plaintiff began working for Defendant on or about June 29, 2023 as a Cashier Associate at Defendant's location at 170 Buc-ee's Blvd., Kodak, Sevier County, TN 37764, and she remained in this role at this location (otherwise herein referred to as the "Kodak store") up through the date of her constructive discharge on February 18, 2024, as hereinafter explained.

9.     During her employment, Plaintiff as well as other female employees were subjected to repeated, ongoing inappropriate sexual advances and harassment by another co-worker, Cashier Associate, Patrick Sargent, as hereinafter alleged.

10.     During her employment, Plaintiff performed her job duties in a competent and satisfactory manner.

11.     During her employment, Plaintiff was never written up or disciplined for any reason.

12.     During her employment, Defendant considered Plaintiff to be a "great" and "excellent" employee.

13.     During her employment, Plaintiff worked the night shift known as the "Third Shift" from 10:00-11:00 PM to 6:30-7:30 AM.

14.     During Plaintiff's employment, the majority of the Cashier Associates on Third

2

Shift worked in or around the cash registers when they were not stocking shelves or cleaning the nearby fountain and coffee bar areas.

15. During Plaintiff's new-hire orientation training, Defendant specifically instructed employees during the new hire orientation training, including Plaintiff, that if they were harassed or made uncomfortable by another employee, then employees are to tell that employee to "stop," and if they do not listen, then report the employee to a supervisor.

16. During Plaintiff's employment, Michael Bui was the Operations District Manager over the store where Plaintiff worked.

17. As Operations District Manager, Michael Bui had the authority to discipline employees, including Plaintiff and Patrick Sargent.

18. As Operations District Manager, Michael Bui had the authority to terminate employees, including Plaintiff and Patrick Sargent.

19. As Operations District Manager, Michael Bui had the authority to investigate complaints of sexual harassment, including the authority to instruct the Human Resources Department to conduct such an investigation.

20. As Operations District Manager, Michael Bui had the duty to make sure that reports of sexual harassment were investigated and handled appropriately.

21. As Operations District Manager, Michael Bui had the duty to make sure that reports of sexual harassment were not ignored.

22. Michael Bui could be disciplined by Defendant if he ignored reports of sexual harassment at one of his stores.

23. Prior to February 18, 2024, Michael Bui was aware of and/or had knowledge that there were complaints of sexual harassment involving a male employee, Patrick Sargent.

3

24.    At no time was Michael Bui subjected to disciplinary action for his actions or inactions involving the sexual harassment complaints against the male employee, Patrick Sargent.

25.    As Operations District Manager, Michael Bui had the authority to eradicate sexual harassment.

26.    During Plaintiff's employment, Charles Creech was the General Manager over the store where Plaintiff worked.

27.    On information and belief, as General Manager, Charles Creech reported to and was supervised by the Operations District Manager, Michael Bui.

28.    As General Manager, Charles Creech had the authority to discipline employees, including Patrick Sargent.

29.    As General Manager, Charles Creech had the authority to terminate employees, including Patrick Sargent.

30.    As General Manager, Charles Creech had the authority to investigate complaints of sexual harassment, including the authority to instruct the Human Resources Department to conduct such an investigation.

31.    As General Manager, Charles Creech had the duty to make sure that reports of sexual harassment were investigated and handled appropriately.

32.    As General Manager, Charles Creech had the duty to make sure that reports of sexual harassment were not ignored.

33.    Charles Creech could be disciplined by Defendant if he ignored reports of sexual harassment at his store.

34.    Prior to February 18, 2024, Charles Creech was aware of and/or had knowledge that there were complaints of sexual harassment involving a male employee, Patrick Sargent.

4

35. At no time was Charles Creech subjected to disciplinary action for his actions or inactions involving the sexual harassment complaints against the male employee, Patrick Sargent.

36. As General Manager, Charles Creech had the authority to eradicate sexual harassment.

37. During Plaintiff's employment, Jose Hernandez was one of the Assistant General Managers at the store where Plaintiff worked.

38. As Assistant General Manager, Jose Hernandez reported to and was supervised by the General Manager, Charles Creech.

39. As Assistant General Manager, Jose Hernandez had the authority to discipline employees, including Patrick Sargent.

40. As Assistant General Manager, Jose Hernandez had the authority to terminate employees, including Patrick Sargent.

41. As Assistant General Manager, Jose Hernandez had the authority to investigate complaints of sexual harassment, including the authority to instruct the Human Resources Department to conduct such an investigation.

42. As Assistant General Manager, Jose Hernandez had the duty to make sure that reports of sexual harassment were investigated and handled appropriately.

43. As Assistant General Manager, Jose Hernandez had the duty to make sure that reports of sexual harassment were not ignored.

44. Jose Hernandez could be disciplined by Defendant if he ignored reports of sexual harassment at his store.

45. Prior to February 18, 2024, Jose Hernandez was aware of and/or had knowledge that there were complaints of sexual harassment involving a male employee, Patrick Sargent.

5

46. At no time was Jose Hernandez subjected to disciplinary action for his actions or inactions involving the sexual harassment complaints against the male employee, Patrick Sargent.

47. As Assistant General Manager, Jose Hernandez had the authority to eradicate sexual harassment.

48. During Plaintiff's employment, Kristin Gross was one of the Night Managers on Plaintiff's shift.

49. As Night Manager, Kristin Gross reported to and was supervised by the General Manager, Charles Creech.

50. As Night Manager, Kristin Gross had the authority to discipline employees on her shift, including Patrick Sargent.

51. As Night Manager, Kristin Gross had the authority to terminate employees on her shift, including Patrick Sargent.

52. As Night Manager, Kristin Gross had the authority to investigate complaints of sexual harassment, including the authority to instruct the Human Resources Department to conduct such an investigation.

53. As Night Manager, Kristin Gross had the duty to make sure that reports of sexual harassment were investigated and handled appropriately.

54. As Night Manager, Kristin Gross had the duty to make sure that reports of sexual harassment were not ignored.

55. Kristin Gross could be disciplined by Defendant if she ignored reports of sexual harassment at her store.

56. Prior to February 18, 2024, Kristin Gross was aware of and/or had knowledge that there were complaints of sexual harassment involving a male employee, Patrick Sargent.

6

57.     At no time was Kristin Gross subjected to disciplinary action for her actions or inactions involving the sexual harassment complaints against the male employee, Patrick Sargent.

58.     As Night Manager, Kristin Gross had the authority to eradicate sexual harassment.

59.     During Plaintiff's employment, Doreen Santo-Domingo was one of the Night Managers on Plaintiff's shift.

60.     As Night Manager, Doreen Santo-Domingo was supervised by and reported to the General Manager, Charles Creech.

61.     As Night Manager, Doreen Santo-Domingo had the authority to discipline employees on her shift, including Patrick Sargent.

62.     As Night Manager, Doreen Santo-Domingo had the authority to terminate employees at on her shift, including Patrick Sargent.

63.     As Night Manager, Doreen Santo-Domingo had the authority to investigate complaints of sexual harassment, including the authority to instruct the Human Resources Department to conduct such an investigation.

64.     As Night Manager, Doreen Santo-Domingo had the duty to make sure that reports of sexual harassment were investigated and handled appropriately.

65.     As Night Manager, Doreen Santo-Domingo had the duty to make sure that reports of sexual harassment were not ignored.

66.     Doreen Santo-Domingo could be disciplined by Defendant if she ignored reports of sexual harassment at her store.

67.     Prior to February 18, 2024, Doreen Santo-Domingo was aware of and/or had knowledge that there were complaints of sexual harassment involving a male employee, Patrick Sargent.

68. At no time was Doreen Santo-Domingo subjected to disciplinary action for her actions or inactions involving the sexual harassment complaints against the male employee, Patrick Sargent.

69. As Night Manager, Doreen Santo-Domingo had the authority to eradicate sexual harassment.

70. During Plaintiff's employment, Audric Franklin was one of the Night Managers on Plaintiff's shift.

71. As Night Manager, Audric Franklin was supervised by and reported to the General Manager, Charles Creech.

72. As Night Manager, Audric Franklin had the authority to discipline employees on his shift, including Patrick Sargent.

73. As Night Manager, Audric Franklin had the authority to terminate employees at on his shift, including Patrick Sargent.

74. As Night Manager, Audric Franklin had the authority to investigate complaints of sexual harassment, including the authority to instruct the Human Resources Department to conduct such an investigation.

75. As Night Manager, Audric Franklin had the duty to make sure that reports of sexual harassment were investigated and handled appropriately.

76. As Night Manager, Audric Franklin had the duty to make sure that reports of sexual harassment were not ignored.

77. Audric Franklin could be disciplined by Defendant if he ignored reports of sexual harassment at her store.

78. Prior to February 18, 2024, Audric Franklin was aware of and/or had knowledge

8

that there were complaints of sexual harassment involving a male employee, Patrick Sargent.

79. At no time was Audric Franklin subjected to disciplinary action for his actions or inactions involving the sexual harassment complaints against the male employee, Patrick Sargent.

80. As Night Manager, Audric Franklin had the authority to eradicate sexual harassment.

81. Plaintiff is female.

82. At all times material hereto, Patrick Sargent was an agent and employee of Defendant.

83. During her employment, Plaintiff and Patrick Sargent were both employed by Defendant as Cashiers.

84. During her employment, Plaintiff and Patrick Sargent were both assigned to work in the same department.

85. During her employment, Plaintiff and Patrick Sargent were both assigned to work the same shift.

86. During his employment, Patrick Sargent engaged in a variety of inappropriate sexual advances and harassment against other employees, particularly female employees, as hereinafter described.

87. During Patrick Sargent's employment, numerous different employees, particularly female employees, complained about Sargent's inappropriate sexual advances and harassment, as hereinafter described.

88. Shortly after Plaintiff was hired in June 2023, on multiple different occasions while working her shift, Plaintiff was repeatedly approached by the male co-worker, Patrick Sargent, and asked to go on dates, and Sargent referred to her as pet names like "honey," "sweetie,"

9

"sweetheart," and "girlfriend," and would come up with excuses to try to "innocently" touch Plaintiff, but, during each of these interactions, Plaintiff promptly rejected Sargent's advances, asked him repeatedly to stop approaching her, stop propositioning her, and to stop calling her pet names, she also tried to explain that she was happily married for 25 years and was not interested in him, and Plaintiff tried to ignore Sargent and focus on her job.

89. However, Patrick Sargent refused to listen to Plaintiff or take her rejections seriously.

90. Patrick Sargent's inappropriate advances, propositions, and pet names for Plaintiff understandably made her feel extremely uncomfortable.

91. After Patrick Sargent would not take "no" for an answer, in or around September 2023, Plaintiff complained to her shift supervisor, the Team Lead at that time, Kristin Gross (who was promoted to Night Manager shortly thereafter), about Sargent's ongoing inappropriate sexual advances and harassment, and Plaintiff provided Gross with multiple examples of Sargent's conduct that made Plaintiff feel uncomfortable.

92. In response to Plaintiff's complaint, Team Lead, Kristin Gross, stated that she was going to conduct an investigation and would get back to Plaintiff.

93. According to Defendant, the Team Lead, Kristin Gross, reported Plaintiff's complaint about Patrick Sargent's conduct to the General Manager, Charles Creech.

94. However, Defendant never conducted any such investigation regarding Patrick Sargent's inappropriate sexual advances and harassment after Plaintiff complained about him in or about September 2023.

95. After Plaintiff complained about Patrick Sargent in or about September 2023, Defendant never spoke with Plaintiff again or otherwise updated her about the status of any

"investigation" into her complaint or the results thereof.

96. Prior to her complaint in or about September 2023, Plaintiff was subjected to inappropriate sexual advances and harassment by Patrick Sargent.

97. As a result of Plaintiff's complaint in or about September 2023, Defendant knew and/or was aware that Plaintiff was subjected to inappropriate sexual advances and harassment by Patrick Sargent.

98. However, Defendant never requested for Plaintiff to provide a written statement regarding Patrick Sargent's conduct around this time in September 2023.

99. Although Plaintiff felt like her complaint about Patrick Sargent's inappropriate sexual advances and harassment was ignored and dismissed, Plaintiff did not want to push the issue due to fear of retaliation, so she tried to focus on her work and doing the best job she could do, but Sargent's inappropriate conduct continued and eventually escalated to him touching Plaintiff.

100. For example, while working at the store on or around October 7, 2023, Patrick Sargent purposely backed into Plaintiff in order to make physical contact with her, and, when Plaintiff told him to watch where he was going, Sargent stated to a customer who witnessed this interaction, "see what I have to put up with?"

101. Plaintiff was very upset by Patrick Sargent's continued sexual harassment, especially since he had now progressed into physically touching Plaintiff.

102. Therefore, immediately after this incident, Plaintiff again approached the Night Manager, Kristin Gross, to complain again about the sexual harassment from Patrick Sargent, including, that he had physically touched her, that she could not take it anymore, and, as a result, Plaintiff specifically demanded to make a formal written complaint against Sargent.

11

103.    In response to Plaintiff's complaints, Night Manager, Kristin Gross, asserted again that Defendant would conduct an "investigation."

104.    Later that same evening during her shift, Plaintiff also complained about Patrick Sargent's inappropriate sexual advances and harassment to another Night Manager on-duty, Doreen Santo-Domingo, the Assistant General Manager, Jose Hernandez, and another female manager (name unknown), and Plaintiff specifically requested again that she be allowed to make a formal written complaint.

105.    In response, Assistant General Manager, Jose Hernandez, stated that Plaintiff's complaint about Patrick Sargent would be written down and investigated.

106.    In early October 2023, Plaintiff requested to provide a formal "written" complaint about Patrick Sargent.

107.    None of Defendant's managers, including but not limited to, Jose Hernandez, Doreen Santo-Domingo, and/or Kristin Gross, ever requested or instructed for Plaintiff to provide her complaint about Patrick Sargent in writing.

108.    After Plaintiff complained to the Night Manager, Doreen Santo-Domingo, about Patrick Sargent in early October 2023, Santo-Domingo, emailed General Manager, Charles Creech, on October 7, 2023, regarding Plaintiff's complaint about Sargent, but Santo-Domingo's email only referenced that Sargent was making "unwelcomed comments towards" Plaintiff, and completely omitted Plaintiff's most recent complaint about Sargent physically touching her. (*See* Email from Santo-Domingo, dated October 7, 2023, attached hereto as Exhibit 1).

109.    In this email, the Night Manager, Doreen Santo-Domingo, further reported to General Manager, Charles Creech, that one of the other Night Managers, Kristin Gross, "had already had a conversation with Patrick [Sargent] regarding professionalism towards other

coworkers – Carol Cooper and April Marion-Griffin." (*See* Exhibit 1).

110. Prior to October 7, 2023, another female employee, April Marion-Griffin, had also complained to Defendant about Patrick Sargent making inappropriate sexual advances and harassment towards her. (*See* Exhibit 1).

111. On and/or before October 7, 2023, April Griffin was subjected to inappropriate sexual advances and harassment by Patrick Sargent.

112. On and/or before October 7, 2023, Defendant knew and/or was aware that April Griffin was subjected to inappropriate sexual advances and harassment by Patrick Sargent.

113. In fact, during her employment, Plaintiff witnessed April Griffin on more than one occasion get upset and/or break down and cry because of Patrick Sargent's inappropriate sexual advances and harassment.

114. Prior to October 7, 2023, Defendant had still not issued any written discipline to Patrick Sargent or conducted any real investigation in connection with Patrick Sargent's conduct towards multiple female employees.

115. Despite being aware of Patrick Sargent's ongoing inappropriate sexual advances and harassment towards multiple female employees, Defendant nevertheless allowed Sargent to continue with his employment and continue to work side-by-side with female employees.

116. Shortly thereafter, on October 9, 2023, April Griffin and another female employee, Jennifer Hancock, also complained about Patrick Sargent's inappropriate sexual advances and harassment.

117. April Griffin provided a handwritten statement to Defendant, dated October 9, 2023, about Patrick Sargent's inappropriate sexual advances and harassment. (April Griffin's Statement, dated October 9, 2023, is attached hereto as Exhibit 2).

13

118.    April Griffin's written complaint dated October 9, 2023 (at Exh. 2) included, in part, the following:

- "I was working coffee. Patrick [Sargent] was working fountain. He kept coming over to coffee to talk and hang out during the shift. As I was stocking sugar he got down on one knee and asked if I would be his sugar."

- "He [Sargent] did it a second time and asked why I didn't answer him. I told him to stop, it's not funny."

- "He [Sargent] has made comments about being 'if only he was 10 yrs younger.'"

- "As the [police] officer walked away [in the store], Patrick [Sargent] yelled across the lane 'I see how it is you love a man in uniform.'"

- "He [Sargent] also has told me he needs to find me a man. I told him I don't talk about my private life at work." (*See* April Griffin's complaint, at Exhibit 2).

119.    Jennifer Hancock provided a handwritten statement to Defendant, dated October 9, 2023, about Patrick Sargent's inappropriate sexual advances and harassment. (Jennifer Hancock's Statement, dated October 9, 2023, is attached hereto as Exhibit 3).

120.    Jennifer Hancock's written complaint dated October 9, 2023 (at Exh. 3) included, in part, the following:

- "Over the month of September, Patrick [Sargent] has approached me and asked me out on several occasions even after me telling him no."

- "He [Sargent] has also told me that women are to do all the cooking and cleaning and take care of men." (*See* Jennifer Hancock's statement, at Exhibit 3).

121.    On or before October 9, 2023, Jennifer Hancock was subjected to inappropriate sexual advances and harassment by Patrick Sargent.

122.    On and after October 9, 2023, Defendant knew and/or was aware that Jennifer Hancock was subjected to inappropriate sexual advances and harassment by Patrick Sargent.

123.    In their written complaints, both April Griffin and Jennifer Hancock complained of sexual harassment, and essentially complained that Patrick Sargent refused to take "no" for an

14

answer in his ongoing and unwelcome advances and pursuit of these female employees. (*See* Exhibits 2 and 3).

124. Oddly enough, around this time in October 2023, Defendant once again never requested for Plaintiff to provide a written statement regarding Patrick Sargent's conduct or otherwise interview her regarding her complaints.

125. Thereafter, Plaintiff was never questioned or interviewed in connection with any "investigation" into her complaints about Patrick Sargent.

126. On October 11, 2023, Plaintiff was abruptly issued a Corrective Action for violating "company policy" because Plaintiff "has missed and/or left early for several of scheduled shifts, including the most recent on 10/11/2023" and this was signed by the General Manager, Charles Creech, as well as by the Human Resources Representative, Alexandria Wendland. (Plaintiff's Corrective Action, dated October 11, 2023, is attached hereto as Exhibit 4).

127. However, Plaintiff was given permission by one of the Night Managers to leave her scheduled shift early on October 11, 2023.

128. Defendant waited until October 20, 2023 to present the Corrective Action (at Exh. 4) to Plaintiff for her signature.

129. Defendant did not give Plaintiff any type of verbal counseling or verbal warning prior to abruptly issuing her the Corrective Action (at Exh. 4).

130. The first time Plaintiff was notified that she allegedly violated the absenteeism policy was when Defendant abruptly issued her the Corrective Action (at Exh. 4).

131. Plaintiff believed the Corrective Action (Exh. 4) was issued to retaliate against her for her complaints of sexual harassment, and the Corrective Action made Plaintiff believe her job was in jeopardy.

15

132.    Thereafter, Plaintiff heard nothing further about the "investigation" into her complaints about Patrick Sargent until a couple weeks later in October 2023 when the Night Manager, Doreen Santo-Domingo, informed Plaintiff that Defendant was "working on" her complaint and the other recently promoted Night Manager, Kristin Gross, would speak to Plaintiff about the harassment complaint when Gross returned from vacation.

133.    A few days later, in late October 2023, the Night Manager, Kristin Gross, informed Plaintiff that Patrick Sargent was "talked to" about his inappropriate sexual advances and harassment, "the problem has been handled," and that Plaintiff "needed to wipe the slate clean" and "let it go," "act like it never happened," and "not hold a grudge" against Sargent.

134.    It is Defendant's position, after Plaintiff's complaint on October 7, 2023, that it assigned Plaintiff and Patrick Sargent to different areas of the store during their overlapping shifts, but, during their shifts, Plaintiff was forced to still work in the same area as Sargent and, when they were not in the same area, Sargent would still simply walk over to Plaintiff's area to make his inappropriate sexual advances and harassment.

135.    At all times material hereto, Defendant had multiple video cameras in different locations throughout the Kodak store which Defendant could have accessed to corroborate Plaintiff's complaints about Patrick Sargent physically touching Plaintiff or otherwise going to her work station and getting in her space, but Defendant failed to do this as part of its alleged investigation.

136.    On and after October 7, 2023, Defendant knew and/or was aware that Plaintiff did not want to work with or near Patrick Sargent.

137.    On and after October 7, 2023, Defendant could have offered Plaintiff to transfer or reassign to a different shift and/or department to get her away from Patrick Sargent, but Defendant

16

failed to do so.

138.    On and after October 7, 2023, Defendant could have transferred or reassigned Patrick Sargent to a different shift and/or department to get him away from Plaintiff and the other female employees who complained about him, but Defendant failed to do so.

139.    Prior to Plaintiff's termination, as hereinafter alleged, Defendant never transferred or reassigned Patrick Sargent to a different shift and/or department.

140.    Prior to Plaintiff's termination, as hereinafter alleged, Defendant never transferred or reassigned, nor offered to transfer or reassign, Plaintiff to a different shift and/or department.

141.    During Plaintiff's employment, Defendant could have transferred or reassigned Patrick Sargent and Plaintiff to different shifts, so that they no longer had to work together, but this was never presented to Plaintiff as an option to address Sargent's ongoing inappropriate sexual advances and harassment to Plaintiff.

142.    Prior to Plaintiff's termination, as hereinafter alleged, the Night Manager, Kristin Gross, also instructed several other female employees with respect to Patrick Sargent's conduct, to "let his behavior go," and/or "let it slide," and/or "wipe the slate clean," or words to that effect.

143.    Despite multiple complaints from female employees, including Plaintiff, April Griffin, and Jennifer Hancock, regarding Patrick Sargent's inappropriate sexual advances and harassment, Defendant decided for Sargent to only be "verbally counseled" due to sexual harassment.

144.    It is Defendant's position that it took prompt and effective remedial action to address the sexual harassment complaints about Patrick Sargent, including in September and October 2023, when Sargent was "verbally counseled."

145. On information and belief, Defendant has no written documented evidence regarding the alleged verbal counseling of Patrick Sargent in September 2023.

146. On information and belief, Defendant has no written documented evidence regarding the alleged verbal counseling of Patrick Sargent in October 2023.

147. At this time in October 2023, due to Defendant's refusal to take any credible action to stop him, Patrick Sargent's conduct towards Plaintiff increasingly escalated to the point where Sargent would try to touch Plaintiff when he was near her at work, such as by brushing up against her and grabbing her hands or arms, and Sargent also started asking Plaintiff more intrusive questions—such as, what type of vehicle she drove, if they could meet after work or ride together, how long it took her to get to work, and was she living alone—all of which made Plaintiff feel extremely uncomfortable and threatened when she walked into, and left, the store because Sargent would wait for her and/or try to walk with her in Defendant's very large parking lot that was emptier than usual due to the start and stop times for their schedule on the Third Shift. Due to her fear of Sargent, Plaintiff would either rush to and/or from her vehicle if Sargent was nearby, or Plaintiff would have to take her time leaving work if Sargent was exiting the store before her.

148. As a result, on or around November 3, 2023, Plaintiff again complained to Night Manager, Kristin Gross, about the sexual harassment and how Plaintiff's work environment had been effected due to Patrick Sargent's ongoing inappropriate sexual advances and harassment, that other female employees were having similar issues with Sargent, and that his conduct was getting worse and becoming more aggressive due to Sargent touching her, and repeatedly asking her intrusive questions, such as, where Plaintiff lived, which way she came into work, if they could ride together, and so forth.

149. Once again, Defendant could have viewed the surveillance video system, including

18

the videos over the parking lot area, to corroborate Plaintiff's complaints, but Defendant failed to do so.

150. In response to Plaintiff complaining about Patrick Sargent's ongoing inappropriate sexual advances and harassment, in early November 2023, the Night Manager, Kristin Gross, again asserted that she would conduct an "investigation" into the complaint.

151. According to Defendant, it was early November 2023, when Defendant finally decided to conduct an "investigation" into the complaints about Patrick Sargent's sexual harassment.

152. Around this timeframe, on or around November 3, 2023, two additional female employees, Vicki Orr and Gissel Olmedo, also complained about Patrick Sargent's inappropriate sexual advances and harassment.

153. Vicki Orr provided a handwritten statement to Defendant, dated November 3, 2023, about Patrick Sargent's inappropriate sexual advances and harassment. (Vicki Orr's Statement, dated November 3, 2023, is attached hereto as Exhibit 5).

154. Vicki Orr's written complaint dated November 3, 2023 (at Exh. 5) included, in part, the following:

- "[D]ue to recent and not so recent events, I have been ask [sic] by management to write down some actions by a coworker that has made me very uncomfortable and begun to affect my work profoundly."

- "It started out weeks ago as harmless talk. Then began to become more personal to the point of him asking me out. That was not alarming to me at all. Then, what I considered to be a form of stalking began."

- "I have went out of my way to avoid him [Sargent]. However, that is affecting my duties as I am now spending a lot of my time looking over my shoulder and hiding in the warehouse to get away from him."

- "I was working in the dog hutch and turned around, he [Sargent] was standing just staring at me. It unnerved me so bad, that I dropped everything in my hands. I am so stressed about

19

this that my hair is beginning to fall out." (*See* Orr's complaint, at Exhibit 5).

155.     On and/or before November 3, 2023, Vicki Orr was subjected to inappropriate sexual advances and harassment by Patrick Sargent.

156.     On and/or before November 3, 2023, Defendant knew and/or was aware that Vicki Orr was subjected to inappropriate sexual advances and harassment by Patrick Sargent.

157.     Gissel Olmedo provided a handwritten statement to Defendant, dated November 3, 2023, about Patrick Sargent's inappropriate sexual advances and harassment. (Gissel Olmedo's Statement, dated November 3, 2023, is attached hereto as Exhibit 6).

158.     Gissel Olmedo's written complaint dated November 3, 2023 (at Exh. 6) included, in part, the following:

- "I'm writing this because I have been experiencing and watching in front of me a concerning matter about a male individual who has been making me and others uncomfortable with comments and actions."

- "I have only been working here less than 3 months, and ever since I've been here I have been hit on by Patrick [Sargent] and turn him down, this is work place and I believe there is boundaries to be respected, I have tried to be cordial with him and say no or just ignore him but he proceeds to get offended and give me a death stare."

- "The event that happened today that just had my last straw was that I was on my way to the iced coffee machine when he stopped what he was doing looked at me and said 'you come to visit me huh?' with a big smile on his face and I had no idea he was there at first till he decided to approach me as such. I said with a straight face 'no.' [H]e proceeded to say 'wow you're giving me the silent treatment' and something else under his breath."

- "I don't feel like it is ok me and my coworkers have to find a way to get away from him [Sargent] every time he works. It does not make me feel safe in the work place and I love my job. This is not the only event that has took place between the three months I've been working here. I believe there is boundaries to be respected, and a line that should never be crossed." (*See* Gissel Olmedo's complaint, at Exhibit 6).

159.     On and/or before November 3, 2023, Gissel Olmedo was subjected to inappropriate sexual advances and harassment by Patrick Sargent.

160.    On and/or before November 3, 2023, Defendant knew and/or was aware that Gissel Olmedo was subjected to inappropriate sexual advances and harassment by Patrick Sargent.

161.    Like Plaintiff, April Griffin, and Jennifer Hancock (at Exhs. 2 and 3), both Vicki Orr and Gissel Olmedo also complained about Patrick Sargent's sexual harassment, and essentially complained that Sargent refused to take "no" for an answer in his ongoing and unwelcome advances and pursuit of these female employees. (*See* Exhibits 5 and 6).

162.    However, around this time in November 2023, Defendant again never requested for Plaintiff to provide a written statement regarding Patrick Sargent's conduct.

163.    Further, once again, Plaintiff was never questioned or interviewed in connection with any "investigation" in November 2023 regarding Patrick Sargent's conduct, nor was Plaintiff ever informed of the findings of any such "investigation."

164.    Unbeknownst to Plaintiff, and despite multiple female employees raising the same or similar complaints about Patrick Sargent's sexual harassment, the only action taken by Defendant following its "investigation" was to issue Sargent a Written Warning for "professionalism," but not for "sexual harassment." (Patrick Sargent's Written Warning, dated November 3, 2023, is attached hereto as Exhibit 7).

165.    As to the "Reason" for Patrick Sargent's Written Warning dated November 3, 2023, the discipline states: "On 11/3/2023, it was reported that Patrick [Sargent] has been making employees feel uncomfortable. Patrick understands that he must be courteous and respectful when interacting with coworkers." (*See* Exhibit 7).

166.    However, nothing changed for Plaintiff after this alleged "investigation" and discipline of Patrick Sargent because Sargent thereafter began stalking Plaintiff to wherever she was working in the store in order to continue to make inappropriate remarks, make sexual advances

towards her, and/or try to touch Plaintiff, despite her repeated requests for him to stop.

167.    Thereafter, going into December 2023 up until Plaintiff's constructive discharge, as hereinafter explained, Plaintiff's managers were noticeably annoyed and dismissive of her complaints about Patrick Sargent's ongoing inappropriate sexual advances and harassment.

168.    For example, at this point, Night Manager, Kristin Gross, was completely dismissive of Plaintiff's complaints about Patrick Sargent and, in response to the complaints, Gross would often state only, "yeah, I know" and then walk away from Plaintiff. The other Night Manager, Doreen Santo-Domingo, was also dismissive of Plaintiff's complaints about Sargent, and Santo-Domingo either completely avoided Plaintiff or became hostile towards Plaintiff and began nitpicking Plaintiff's performance whenever she complained about Sargent, and otherwise began treating Plaintiff like a troublemaker for continuing to complain about Sargent. As a result, Plaintiff became fearful she would receive further retaliation, and that a reason would be found to fire her.

169.    The stress and anxiety from Patrick Sargent's ongoing inappropriate sexual advances and harassment, that Defendant refused to correct, also severely impacted Plaintiff's overall health, as she began experiencing debilitating migraines, diverticulitis, and panic attacks, and these health issues got worse over time as Plaintiff continued to work in these conditions to the point that she was experiencing more frequent panic attacks going into 2024 and was on the verge of a complete nervous breakdown.

170.    During Plaintiff's employment, due to increased stress, anxiety, and health issues caused by Patrick Sargent that Defendant refused to address, Plaintiff's medical provider also increased her medication for anxiety related issues on at least two different occasions.

171.    In early February 2024, Plaintiff again complained to her manager, Night Manager,

Kristin Gross, about Patrick Sargent's ongoing inappropriate sexual advances and harassment, and Plaintiff further complained that other co-workers told Plaintiff that Sargent told them that his "Christmas wish" was a "young girl," and Plaintiff explained to Gross that this also put all of the customers at risk as well as female coworkers, and Plaintiff specifically identified to Gross the coworkers who heard Sargent make this remark while they were sitting in the breakroom.

172. In response, the Night Manager, Kristin Gross, asserted that she would "check it out" with respect to Plaintiff's complaint about Patrick Sargent.

173. On information and belief, after Plaintiff reported Patrick Sargent's continued inappropriate conduct in early February 2024, including Sargent's remarks to the other co-workers, Defendant apparently never bothered to question the co-workers in the breakroom at that time about Sargent's inappropriate remarks.

174. As a result, Defendant again failed to investigate or take seriously Plaintiff's complaints (or, the complaints made by the other females) about Patrick Sargent's ongoing inappropriate sexual advances and harassment, and Plaintiff continued to live in a constant state of fear, stress, and anxiety of what Sargent might do next, and knowing that Defendant was not going to stop Sargent's conduct, including her fear that she could be sexually assaulted by him or otherwise harmed by him.

175. Finally, on February 16, 2024, while Plaintiff was at the store cleaning the coffee bar area with her back exposed, another co-worker, Cynthia (last name unknown), walked behind Plaintiff and innocently tapped her on the shoulder to get her attention.

176. However, due to Plaintiff's increased stress, anxiety, and health issues caused by Patrick Sargent's unwanted conduct, however, Plaintiff actually feared for her life in that moment because she thought it was Sargent trying to touch or grab her from behind, due to him also

23

working in Plaintiff's area in the store.

177.   As a result of this interaction, Plaintiff started crying and began having a panic attack, even after she realized that it was one of her co-workers, not Patrick Sargent, who had actually touched her shoulder.

178.   As a result of this interaction, and knowing that Defendant was going to do nothing to stop Patrick Sargent's inappropriate sexual advances and harassment that was causing Plaintiff to live in a constant state of fear, stress, anxiety, and causing her other health issues, Plaintiff could not return to work under those conditions, so she concluded at that time that she had no choice but to resign from her job and she was constructively discharged on February 17, 2024.

179.   On February 17, 2024, Plaintiff called Defendant's telephone number (865) 422-4385 at 6:22 PM and at 6:23 PM, and eventually spoke with the Second Shift Manager on Duty, a female, and, during this call, Plaintiff explained that due to the stress and harassment she complained about, she could not take the work environment anymore, and she had to quit.

180.   It is Defendant's position that Plaintiff was terminated for being a "no call/no show" for her shift scheduled to start at 10:00 PM on February 18, 2024. (*See* Plaintiff's Termination Notice, dated February 21, 2024, attached hereto as Exhibit 8).

181.   During Plaintiff's employment, she was subjected to repeated, unwanted, advances of a sexual nature, including, but not limited to, inappropriate comments, touching, and grabbing, and these actions were uninvited, unwelcomed, and resented by the Plaintiff.

182.   Plaintiff reported the sexually harassing conduct to supervisory employees of Defendant, but no serious action was taken to stop the conduct and her complaints were ignored.

183.   During Plaintiff's employment, several other female employees were also subjected to Patrick Sargent's inappropriate sexual advances and harassment.

24

184. During Plaintiff's employment, several other female employees also lodged complaints to supervisory personnel of Defendant, but Defendant did not take any serious action to stop the conduct Patrick Sargent because, thereafter, he continued to engage in the same conduct.

185. During Plaintiff's employment, Defendant's supervisory and management personnel were aware of the complaints about Patrick Sargent, but Defendant did not correct or attempt to address each complaint.

186. Prior to Plaintiff's termination, Defendant made it clear that it would not take any action or appropriate measures to address Plaintiff's complaints of discrimination, harassment, or hostile work environment, or otherwise protect her from Patrick Sargent, and, in fact, Plaintiff was blamed for Sargent's conduct.

187. As a result of the ongoing inappropriate sexual advances and harassment, and Defendant's refusal to address the same or take any serious action to protect the Plaintiff from Patrick Sargent, Plaintiff's working environment became so unbearable that she reasonably believed that quitting was her only option, especially after her repeated complaints fell on deaf ears, and she therefore resigned on February 18, 2024.

188. Plaintiff was constructively discharged on February 18, 2024, however, Defendant claims it fired Plaintiff on February 18, 2024 for being a "no call/no show." (*See* Exh. 8).

189. It is Defendant's position that it fired Plaintiff on February 18, 2024.

190. Prior to Plaintiff's termination, Defendant never requested for Plaintiff to provide in writing her complaints about the conduct of Patrick Sargent.

191. Prior to Plaintiff's termination, Defendant only conducted one "investigation" in connection with the conduct of Patrick Sargent.

192. Prior to Plaintiff's termination, Defendant only issued one written discipline to

Patrick Sargent due to his conduct.

193.    Defendant did not discipline or terminate Patrick Sargent due to Plaintiff's constructive discharge on February 18, 2024.

194.    Less than a week after Plaintiff's constructive discharge, Defendant terminated Patrick Sargent on February 22, 2024.

195.    According to Patrick Sargent's Termination Notice, Defendant terminated Sargent because: "During a company investigation, it was brought to management's attention on 02/21/2024, Patrick Sargent was making comments to coworkers that made them feel uncomfortable. It was reported that Patrick Sargent said he really likes 16-year-old girls, the younger the better, & that he wants to find a 16-year-old." (Patrick Sargent's Termination Notice, dated February 22, 2024, is attached hereto as Exhibit 9).

196.    Defendant issued Patrick Sargent's Termination Notice on February 22, 2024 (at Exh. 9), the day after Plaintiff's Termination Notice was issued on February 21, 2024 (at Exh. 8).

197.    After Defendant fired Sargent, at no time did Defendant contact Plaintiff and inform her that Patrick had been fired or otherwise ask her to come back to work.

198.    At all times material hereto, the sexually inappropriate and harassing conduct of Defendant's employee, Patrick Sargent, was uninvited, unwelcomed, and resented on Plaintiff's part and constituted a hostile and abusive work environment.

199.    At all times material hereto, Plaintiff did not invite, encourage, or condone the sexual advances and conduct of Defendant's employee, Patrick Sargent.

200.    The conduct of Defendant's employee, Patrick Sargent, was sufficiently severe or pervasive such as to alter the conditions of Plaintiff's employment.

201.    The conduct of Defendant's employee, Patrick Sargent, was sufficiently severe that

Plaintiff feared that she could be physically harmed.

202.    Defendant is responsible and liable for the discriminatory and harassing conduct of its agents and employees under the doctrine of respondent superior and under agency principles.

203.    Plaintiff was constructively discharged as a result of Defendant's unlawful discrimination, pervasive hostile work environment and sexual harassment, and in retaliation for complaining about sex discrimination, sexual harassment, hostile work environment, and retaliation.

204.    During Plaintiff's employment, she was subjected to a constant pattern of sexual harassment and discrimination because of her sex.

205.    Plaintiff complained directly to management about Patrick Sargent's conduct on numerous occasions, but to no avail.

206.    At all times material hereto, Defendant has a state-of-the-art surveillance system throughout its store and parking lot.

207.    At all times material hereto, Defendant's surveillance system had cameras and microphones recording both video and audio throughout the premises of the store and parking lot.

208.    Therefore, the underlying incidents regarding Patrick Sargent's inappropriate conduct and/or remarks that multiple females complained about, including Plaintiff, would have been captured on Defendant's audio and video surveillance system.

209.    On information and belief, Defendant never checked its surveillance system for the video and/or audio recordings of Patrick Sargent's complained of conduct.

210.    On information and belief, Defendant did not preserve any video and/or audio recordings evidencing Patrick Sargent's complained of conduct.

211.    In comparison, for example, Defendant's final report regarding a theft that Plaintiff

27

reported before her termination on January 25, 2024 noted that the suspect's activity was captured on nine (9) different surveillance cameras throughout the store and parking lot.

212.     Defendant's agents and employees knew, or should have known, about the discrimination, sexual harassment, hostile work environment, and retaliation, yet Defendant failed to take any serious remedial action.

213.     Plaintiff was forced to quit her job because Defendant made her working conditions intolerable.

214.     Defendant's conduct constitutes sexual harassment, hostile work environment, discrimination, and retaliation against Plaintiff affecting the terms and conditions of her employment because of her sex and/or because of her complaints of discrimination, sexual harassment, hostile work environment, and retaliation in violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, the Civil Rights Act of 1991, 42 U.S.C. § 1981a, *et seq.*, and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, *et seq.*

215.     Employers such as Defendant must train managers on the laws prohibiting sexual harassment in the workplace.

216.     Employers such as Defendant must supervise managers to ensure compliance with the laws prohibiting sexual harassment.

217.     Employers such as Defendant must prevent sexual harassment in the workplace in order to protect employees.

218.     Employers such as Defendant must eradicate sexual harassment in the workplace in order to protect employees.

219.     Employers such as Defendant must conduct fair, honest, and unbiased investigations.

28

220.     Plaintiff filed a timely Charge of Discrimination and Retaliation with both the Tennessee Human Rights Commission and Equal Employment Opportunity Commission ("EEOC") on or about February 29, 2024.  (Plaintiff's EEOC Charge, is attached hereto as Exhibit 10, and same is incorporated herein by reference).

221.     On December 4, 2024, Plaintiff received a Notice of Right to Sue from the EEOC. (Notice of Right to Sue from the EEOC, is attached hereto as Exhibit 11, and same is incorporated herein by reference).

222.     Plaintiff filed this suit within ninety (90) days of the date of the Notice of Right to Sue (at Exh. 11).

223.     This suit is timely filed.

224.     As a result of Defendant's conduct, the Plaintiff has lost tangible job benefits, she sustained other pecuniary losses, including a loss of income and benefits, both past and future, and she sustained substantial emotional distress, humiliation, and embarrassment.

225.     Defendant's conduct was intentional, reckless, and/or malicious and are sufficient to justify the imposition of punitive damages.

226.     Defendant's conduct was a knowing violation and/or in reckless disregard of Plaintiff's federally protected rights sufficient to justify the imposition of punitive damages.

**WHEREFORE**, the Plaintiff prays for the following relief against Defendant:

1.     Compensatory damages, including back pay and front pay (or in the Court's discretion, reinstatement, if deemed appropriate);

2.     Punitive damages;

3.     Reasonable attorney's fees;

4.     Prejudgment interest;

29

5.      Costs of this action;

6.      A jury to try this cause; and

7.      Appropriate injunctive relief ordering Defendant to cease and desist from engaging in discriminatory and retaliatory acts, and to undergo such training in discrimination and retaliation as is appropriate.

RESPECTFULLY SUBMITTED this 27th day of December, 2024.

THE BURKHALTER LAW FIRM, P.C.

s/David A. Burkhalter, II
David A. Burkhalter II, TN BPR #004771
D. Alexander Burkhalter, III, TN BPR #033642
Zachary J. Burkhalter, TN BPR #035956
Attorneys for Plaintiff
P.O. Box 2777
Knoxville, Tennessee  37901
(865) 524-4974

30